ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL GENERAL DE JUSTICIA
TRIBUNAL DE APELACIONES
**PANEL ESPECIAL**

| | | |
|---|---|---|
| **HERI RODRÍGUEZ CARDONA**<br>QUERELLANTE(S)-RECURRIDA(S)<br><br>V.<br><br>**WINDMAR P.V. ENERGY INC.**<br>QUERELLADA(S)-RECURRENTE(S)<br><br>**SUNNOVA ENERGY CORP. H/N/C SUNNOVA ENERGY PUERTO RICO, LLC; UNITED SURETY AND INDEMNITY CO.; THE GUARANTEE COMPANY OF NORTH AMERICA**<br>QUERELLADA(S) | **KLRA202300500** | *REVISIÓN DE DECISIÓN ADMINISTRATIVA* procedente del Departamento de Asuntos del Consumidor (DACo)<br><br>Caso Núm.<br>**SAN-2021-0009759**<br><br>Sobre:<br>Ley Núm. 5 de 23 de abril de 1973 |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Juez Barresi Ramos y el Juez Cruz Hiraldo.[1]

*Barresi Ramos*, juez ponente.

## S E N T E N C I A

En San Juan, Puerto Rico, hoy día 14 de julio de 2025.

Comparece ante este Tribunal de Apelaciones, **WINDMAR P.V. ENERGY, INC. (WINDMAR)** mediante *Recurso de Revisión Judicial* interpuesta el 20 de septiembre de 2023. En su escrito, nos solicita que revisemos la *Resolución* prescrita el 21 de agosto de 2023 por el **DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR (DACO).**[2] Mediante esta decisión administrativa, entre otras cosas, se declaró ha lugar la desestimación de la causa de acción contra **SUNNOVA ENERGY CORP. H/N/C SUNNOVA ENERGY PUERTO RICO (SUNNOVA)** y **THE GUARANTEE COMPANY OF NORTH AMERICA USA (GCNA)**; ha lugar la *Querella*; en consecuencia, se ordenó a **WINDMAR** honrar al señor **HERI RODRÍGUEZ CARDONA** (señor **RODRÍGUEZ CARDONA**) los microinversores

---

[1] En virtud de la *Orden Administrativa OATA-2025-070* de 9 de mayo de 2025, el Juez Cruz Hiraldo sustituyó al Juez Bermúdez Torres quien cesó de ejercer funciones en el Tribunal de Apelaciones.
[2] Apéndice del *Recurso de Revisión Judicial,* págs. 574- 585.

IQ7+ sustituyendo los IQ7 instalados dentro del término de veinte (20) días calendarios; y se apercibió que el incumplimiento podría conllevar la imposición de una multa administrativa de hasta $10,000.00.

Exponemos el trasfondo fáctico y procesal que acompaña a la presente controversia.

- I -

El 20 de septiembre de 2021, el señor **RODRÍGUEZ CARDONA** instó una *Querella* en contra de **WINDMAR;** y **SUNNOVA** ello al amparo de la Ley Núm. 5 de 23 de abril de 1973, y según enmendada, conocida como la *Ley Orgánica del Departamento de Asuntos del Consumidor*.[3] En la *Querella*, el señor **RODRÍGUEZ CARDONA** alegó que al momento de la venta del sistema fotovoltaico, el señor Edwin Colón, representante de **WINDMAR,** le recomendó instalar un sistema de veinte (20) placas; acordaron veinticuatro (24) placas para cubrir el consumo extra de una consola de aire acondicionado para el cuarto de su hijo; y discutieron sobre el equipo que se instalaría, en específico, los microinversores. Aseguró que en la negociación convinieron que se instalarían los equipos modernos (microinversor IQ7+). Arguyó que **WINDMAR** no montó el equipo acordado y ha reclamado la instalación de microinversor IQ7+.

El 12 de octubre de 2021, **GCNA,** sin someterse a la jurisdicción, presentó una *Moción Solicitando Referido a Arbitraje y/o Desestimación* en la cual adujo que **DACo** carecía de jurisdicción para atender la reclamación por existir una cláusula de arbitraje en el ACUERDO DE MEJORAS PARA EL HOGAR (ACUERDO) suscrito entre las partes que disponía que cualquier petitoria debía ser atendida por la *American Arbitration Association*.[4] El 17 de diciembre de 2021, **WINDMAR** presentó una *Moción Asumiendo Represesntación Legal y Solicitando Desestimación por Falta de Jurisdicción* en

---

[3] Apéndice del *Recurso de Revisión Judicial,* págs. 1- 6.
[4] *Íd.*, págs. 7- 88.

la cual interpeló la desestimación de la *Querella*, por **DACo** carecer de jurisdicción.[5] Acompaño copia del ACUERDO.

El 24 de febrero de 2022, se celebró una audiencia administrativa en la cual, **WINDMAR** y **SUNNOVA** argumentaron que **DACo** carecía de jurisdicción. A los pocos días, el 28 de febrero de 2022, **DACo** emitió una *Resolución Interlocutoria*.[6] Escuchado los planteamientos de las partes, el **DACo** determinó tener jurisdicción para atender las controversias sobre alegados anuncios y prácticas comerciales engañosas. Por tal razón, declaró no ha lugar la *Moción Solicitando Referido a Arbitraje y/o Desestimación* presentada por **GCNA** y no ha lugar la *Moción Asumiendo Representación Legal y Solicitando Desestimación por Falta de Jurisdicción* presentada por **WINDMAR**.

Prontamente, el 9 de marzo de 2022, el señor **RODRÍGUEZ CARDONA** presentó una *Enmienda a Querella* a los fines de incluir como partes querelladas a: **UNITED SURETY & INDEMNITY CO.** (**USIC**), compañía aseguradora de **WINDMAR**; y a **THE GUARANTEE COMPANY OF NORTH AMERICA USA** (**GCNA**).[7] El día 17 de mayo de 2022, el señor **RODRÍGUEZ CARDONA** presentó una *Moción* en la cual anunció los documentos que pretendía utilizar en la audiencia administrativa.[8]

El 26 de mayo de 2022, **DACo** dictó una *Resolución Sumaria* en la cual, entre otras cosas, expuso estar imposibilitado de conceder como remedio un referido a la *American Arbitration Association* por haber sido ésta cancelada para hacer negocios en Puerto Rico; quedando como única vía adjudicar la controversia bajo el *Reglamento de Prácticas Comerciales* conocido como el Reglamento 9158 del **DACo**; y declaró ha lugar la *Querella* incoada por el

---

[5] Apéndice del *Recurso de Revisión Judicial,* págs. 89- 168.
[6] *Íd.,* págs. 169- 176.
[7] *Íd.,* págs. 177- 181.
[8] *Íd.,* págs. 182- 205. Los documentos consistieron en: (1) WhatsApp printscreen of conversation/transaction; (2) "Bill" de AEE utilizado; (3) Sunnova Quote enviado por WhatsApp; (4) Estimado de Windmar enviado por WhatsApp; y (5) Printscreen de facturas a pagar de Luma Energy, últimos doce (12) meses. La Cotización número 19780 fechada 26 de marzo de 2020 hace alusión al equipo inversores: *Enphase Micro-Inverters IQ7*.

señor **RODRÍGUEZ CARDONA**.[9] En su fallo, **DACo** concretó que resultó en una práctica engañosa la omisión presentada en el *Contrato Integrado de Servicios o Acuerdo de Mejoras Para el Hogar*, en la página 2, acápite 3, toda vez que la compañía "anuncia y/o comunica de manera vaga o confusa el microinversor como *Enphase Energy, Inc.*, compañía fabricante de los microinversores *IQ7* e *IQ7+*, omitiendo como dato relevante el modelo a ser fijado en la residencia [del señor **RODRÍGUEZ CARDONA**]". Por ende, ordenó a **WINDMAR** y **SUNNOVA** que solidariamente le honren al señor **RODRÍGUEZ CARDONA** los microinversores *IQ7+*, sustituyendo los *IQ7* instalados dentro del plazo de veinte (20) días calendarios.

El 15 de junio de 2022, **SUNNOVA** y **GCNA** presentaron, sin someterse a la jurisdicción, una *Moción de Reconsideración* acompañada de copia de la cotización número 19780 fechado 26 de marzo de 2020 y página 28 del ACUERDO suscrito el 28 de marzo de 2020.[10] En síntesis, reiteraron que **DACo** carecía de jurisdicción dado que el ACUERDO o contrato entre las partes justificaba la paralización del procedimiento administrativo para iniciar el reclamo ante el foro de arbitraje; y, **DACo** se extralimitó en su función adjudicativa al dictaminar una *Resolución Sumaria*, basándose en las alegaciones del señor **RODRÍGUEZ CARDONA** y en una conclusión errada de los documentos sometidos. De igual manera, el 16 de junio de 2022, **WINDMAR** presentó su *Moción en Solicitud de Reconsideración a Resolución Sumaria*.[11] Razonó que **DACo** decidió erróneamente que no existían controversias reales. El 21 de junio de 2022, **DACo** expidió una *Orden* en la cual acogió las solicitudes de reconsideración; señaló una audiencia administrativa para el 29 de julio de 2022; y dejó en suspenso la *Resolución Sumaria*.[12]

---

[9] Apéndice del *Recurso de Revisión Judicial*, págs. 206- 217. La *Resolución Sumaria* fue notificada el 27 de mayo de 2022.
[10] Apéndice del *Recurso de Revisión Judicial*, págs. 218- 237.
[11] *Íd.*, págs. 238- 273.
[12] *Íd.*, págs. 274- 277.

Más tarde, el 19 de agosto de 2022, **DACo** decretó un *Tracto Procesal* en la cual declaró ha lugar la solicitud de transferencia; requirió a **SUNNOVA** la cancelación de un arancel de $20.00 dentro de diez (10) días; y pautó señalamiento para el 6 de septiembre de 2022.[13]

El 9 de septiembre de 2022, **DACo** profirió una *Orden de Mostrar Causa* concerniente a haber dejado sin efecto la audiencia administrativa pautada para el 6 de septiembre de 2022.[14] En su dictamen, les requirió a todas las partes mostrar causa por la cual no habían cumplido con la Regla 21.3 del *Reglamento de Procedimientos Adjudicativos* de **DACo;** y presentar *Moción en Cumplimiento de Orden* conjunta sometiendo tres (3) fechas hábiles para la celebración de la audiencia administrativa en reconsideración.[15] En estas circunstancias, el 29 de septiembre de 2022, las partes presentaron *Moción Conjunta en Cumplimiento de Orden*.[16] Así, el 30 de septiembre de 2022, **DACo** promulgó un *Tracto Procesal* en el cual se pautó una audiencia administrativa para el 28 de octubre de 2022.[17]

Posteriormente, el 6 de octubre de 2022, **DACo** dictaminó una *Orden* exponiendo: "tras una revisión del tracto del caso y la Regla 29.2 del Reglamento de Procedimientos adjudicativos del DACo, el Departamento entiende que ha perdido jurisdicción sobre la querella de epígrafe".[18] Dada las circunstancias, dejó sin efecto la audiencia administrativa señalada para el 28 de septiembre de 2022; expuso que permanecía en pleno vigor y efecto la *Resolución Sumaria;* y apercibió que las partes afectadas podrían acudir ante el Tribunal de Apelaciones.

Inconformes, el 13 de octubre de 2022, **SUNNOVA** y **GNCA** entablaron un *Recurso de Revisión Judicial* (**KLRA202200579**) ante el Tribunal de Apelaciones.[19] Al próximo día, el 14 de octubre de 2022, **WINDMAR** interpuso

---

[13] Apéndice del *Recurso de Revisión Judicial*, págs. 278- 288.
[14] *Íd.*, págs. 295- 299.
[15] *Íd.*, págs. 295- 299.
[16] *Íd.*, págs. 300- 301.
[17] Apéndice del *Recurso de Revisión Judicial*, págs. 302- 312.
[18] *Íd.*, págs. 313- 316.
[19] *Íd.*, págs. 317- 348.

un *Recurso de Revisión Judicial* (**KLRA202200583**).[20] Después, el 27 de enero de 2023, este Panel pronunció *Sentencia* desestimando el recurso por falta de jurisdicción ante su presentación prematura.[21] Ello ante la falta de notificación a todas las partes según requiere la *Ley de Procedimiento Administrativo Uniforme*. Así pues, el 10 de mayo de 2023, **DACo** notificó nuevamente la *Resolución Sumaria*.[22]

Al poco tiempo, el 22 de mayo de 2023, **Sunnova** y **GCNA** presentaron, sin someterse a la jurisdicción, una *Moción de Reconsideración* en la cual reprodujeron sus argumentos sobre la falta de jurisdicción de **DACo** para atender el asunto y afirmaron que no existía una reclamación que justificara la concesión de un remedio.[23] Por su parte, el 23 de mayo de 2023, **Windmar** presentó una *Moción en Solicitud de Reconsideración a Resolución Sumaria* en la cual sustentó que **DACo** debía desestimar por falta de jurisdicción y, en la alternativa, rogó una audiencia administrativa para dilucidar las controversias.[24]

El 25 de mayo de 2023, **DACo** resolvió una *Resolución en Reconsideración* ordenando la celebración de una audiencia en reconsideración y pautada para el 19 de junio de 2023.[25] El 13 de julio de 2023, **Sunnova** y **GCNA** comparecieron, sin someterse a la jurisdicción, mediante *Moción Informativa* para puntualizar que advinieron en conocimiento que el *American Arbitration Association Inc.*, se había reincorporado ante el Departamento de Estado de Puerto Rico, por lo que solicitaron se tomara conocimiento.[26]

En la audiencia celebrada el 18 de julio de 2023, el señor **Rodríguez Cardona** desistió de su reclamación contra **Sunnova** y **GCNA**.[27]

---

[20] *Íd.*, págs. 349- 365.
[21] Apéndice del *Recurso de Revisión Judicial*, págs. 385- 396.
[22] *Íd.*, págs. 397- 409.
[23] *Íd.*, págs. 411- 431.
[24] *Íd.,* págs. 432- 468.
[25] Apéndice del *Recurso de Revisión Judicial,* págs. 469-473
[26] *Íd.*, págs. 474- 479.
[27] *Íd.,* pág. 575.

Subsecuentemente, el 21 de agosto de 2023, **DACo** decidió la *Resolución* impugnada.[28]

En desacuerdo, el 20 de septiembre de 2023, **WINDMAR** acudió ante este foro intermedio mediante el *Recurso de Revisión Judicial.* En el mismo, señaló el(los) siguiente(s) error(es):

> Erró el Departamento de Asuntos del Consumidor (DACO) al declararse con jurisdicción sobre la materia para adjudicar la Querella aun cuando las partes acordaron el procedimiento de arbitraje como foro exclusivo para dilucidar todas las controversias relacionadas al acuerdo de mejoras al hogar, a reclamos que surjan o estén relacionados a la relación entre las partes y reclamos que hayan surgido antes del acuerdo.

> Erró el Departamento de Asuntos del Consumidor (DACO) al emitir Resolución a favor de la querellante contraria a la prueba que se presentó en la vista administrativa y que obra en el expediente de la querella.

El 22 de septiembre de 2023, intimamos *Resolución* en la cual concedimos un término de treinta (30) días al señor **RODRÍGUEZ CARDONA, SUNNOVA, UNITED SECURITY AND INDEMNITY CO. (UNITED)** y **GCNA** para presentar sus alegatos en oposición. Entonces, el 26 de octubre de 2023, el señor **RODRÍGUEZ CARDONA** presentó su *Alegato en Oposición a Recurso de Revisión*. Al día de hoy, no han comparecido **SUNNOVA, UNITED** y **GCNA**.

Evaluado concienzudamente el expediente del caso y contando con el beneficio de las comparecencias de **WINDMAR** y el señor **RODRÍGUEZ CARDONA**, nos encontramos en posición de adjudicar. Puntualizamos las normas de derecho pertinentes a la(s) controversia(s) planteada(s).

## - II –

### - A - *Revisión Judicial*

La Ley Núm. 38 de 30 de junio de 2017, según enmendada, conocida como la *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico* (LPAU) provee un cuerpo de reglas mínimas para gobernar los procesos de adjudicación y reglamentación en la administración pública.[29] Su sección

---

[28] *Íd.,* págs. 574- 585.
[29] 3 LPRA § 9601-9713; *SLG Saldaña-Saldaña v. Junta*, 201 DPR 615, 621 (2018).

4.1 instituye la *revisión judicial* de las determinaciones finales de las agencias por este Tribunal de Apelaciones.[30]

La *revisión judicial* tiene como propósito limitar la discreción de las agencias y asegurarse de que estas desempeñen sus funciones conforme a la ley.[31] El criterio rector al momento de pasar juicio sobre una decisión de un foro administrativo es la *razonabilidad* de la actuación de la agencia.[32] Nuestra evaluación de la decisión de una agencia se circunscribe, entonces, a determinar si esta actuó de forma arbitraria, ilegal o irrazonable, o si sus acciones constituyen un abuso de discreción.[33]

Empero, las decisiones de los organismos administrativos especializados gozan de una presunción de legalidad y corrección, por lo que, sus conclusiones e interpretaciones merecen gran consideración y respeto.[34] Por ello, al ejecutar nuestra función revisora, este Tribunal está obligado a considerar la especialización y experiencia de la agencia, distinguiendo entre cuestiones de interpretación estatutaria—sobre las que los tribunales son especialistas—y cuestiones propias de la discreción o pericia administrativa.[35] Ello implica que los dictámenes de los entes administrativos merecen deferencia judicial.[36]

Ahora bien, tal norma no es absoluta. Nuestro más Alto Foro ha instaurado que no podemos dar deferencia a las determinaciones administrativas que sean irrazonables, ilegales o contrarias a derecho.[37] Particularmente, concretó las normas básicas sobre el alcance de la *revisión judicial* al expresar:

---

[30] 3 LPRA § 9671.
[31] *Torres v. Junta Ingenieros*, 161 DPR 696, 707 (2004). Véase, además Javier A. Echevarría Vargas, *Derecho Administrativo Puertorriqueño*, Ediciones Situm (2017), págs. 304– 306.
[32] *Fonte Elizondo v. F & R Const.*, 196 DPR 353 (2016); *Otero v. Toyota*, 163 DPR 716 (2005); *Otero Rivera v. Bella Retail Group, Inc.*, 2024 TSPR 70, 213 DPR ___ (2024). Véase, además: D. Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, 2da ed., Bogotá, Ed. Forum, 2001, pág. 543.
[33] *Pérez López v. Depto. Corrección*, 208 DPR 656, 660 (2022).
[34] *Transporte Sonnell, LLC v. Junta de Subastas de la Autoridad de Carreteras*, 2024 TSPR 82; 214 DPR ____ (2024); *Torres Rivera v. Policía de PR,* 196 DPR 606, 625- 626 (2016)*; García Reyes v. Cruz Auto Corp.*, 173 DPR 870, 891 (2008).
[35] *OCS v. Point Guard Ins.*, 205 DPR 1005, 1028 (2020).
[36] *DACO v. Toys "R" Us*, 191 DPR 760, 765 (2014).
[37] *Torres Rivera v. Policía de PR, supra, pág. 628.*

> [L]os tribunales deben dar deferencia a las decisiones de una agencia administrativa, pero ésta cederá cuando: (1) la determinación administrativa no está basada en evidencia sustancial; (2) el ente administrativo erró en la aplicación o interpretación de las leyes o reglamentos que se le ha encomendado administrar; (3) el organismo administrativo actuó arbitraria, irrazonable o ilegalmente, realizando determinaciones carentes de una base racional, o (4) la actuación administrativa lesionó derechos constitucionales fundamentales. Es importante destacar que, si el tribunal no se encuentra frente a alguna de esas situaciones, aunque exista más de una interpretación razonable de los hechos procede que se valide la interpretación que realizó la agencia administrativa recurrida.[38]

Primordialmente, el alcance de la *revisión judicial* de las determinaciones administrativas se ciñe a determinar lo siguiente: (1) si el remedio concedido por la agencia fue el apropiado; (2) si las determinaciones de hecho de la agencia están basadas en *evidencia sustancial* que obra en el expediente administrativo, y (3) si las conclusiones de derecho fueron las correctas.[39]

En cuanto a las determinaciones de hechos, estas serán sostenidas por los tribunales si están respaldadas por *evidencia sustancial* que surja del expediente administrativo considerado en su totalidad.[40] La *evidencia sustancial* es aquella relevante que una mente razonable puede aceptar como adecuada para sostener una conclusión.[41] Debido a la presunción de regularidad y corrección que cobija a las decisiones de las agencias administrativas, quien alegue ausencia de *evidencia sustancial* debe presentar prueba suficiente para derrotar dicha presunción.[42] Para ello "tiene que demostrar que existe otra prueba en el expediente que reduzca o menoscabe el valor probatorio de la evidencia impugnada, hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración".[43] De modo que no podrá basarse únicamente en simple alegaciones. A esto se le conoce como la norma de la *evidencia sustancial*, con la cual se persigue evitar sustituir el

---

[38] *Íd.*

[39] Sección 4.5 de la LPAU, 3 LPRA § 9675; *OEG v. Martínez Giraud*, 210 DPR 79, 89 (2022).

[40] *Ex Parte Acosta Cardona*, 201 DPR 26, 36 (2018).

[41] *Otero v. Toyota, supra,* pág. 728.

[42] *Graciani Rodríguez v. Garaje Isla Verde*, 202 DPR 117, 128 (2019).

[43] *Gutiérrez Vázquez v. Hernández y otros*, 172 DPR 232, 244 (2007).

criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor.[44] Por lo tanto, aun cuando exista más de una interpretación razonable de los hechos, el tribunal debe dar deferencia a la agencia, y no sustituir su criterio por el de esta.[45]

Por otro lado, las conclusiones de derecho de la agencia son revisables en todos sus aspectos, sin sujeción a norma o criterio alguno.[46] Nuestro Máximo Foro ha expresado que "los tribunales deben ejercer un juicio independiente al decidir si una agencia ha actuado dentro del marco de sus facultades estatutarias".[47] Es decir, no existe deferencia en la interpretación de derecho realizada por una agencia administrativa, debido a que esto es una función consustancial de los tribunales de justicia.[48]

En resumen, si la decisión recurrida es razonable y se sostiene en la *evidencia sustancial* que obra en el expediente administrativo, procede su confirmación.[49] A *contrario sensu*, los tribunales revisores podemos intervenir con la decisión recurrida cuando no está basada en *evidencia sustancial*, o cuando la actuación es arbitraria, irrazonable o ilegal, o cuando afecta derechos fundamentales.[50] Del mismo modo, el Prof. Echevarría Vargas ha apuntalado que las decisiones de las agencias gubernamentales no deben ser "revocadas o modificadas salvo que conste una actuación arbitraria, ilegal o irrazonable".[51]

### - B - *Contratos*

En Puerto Rico, rige el principio de la *libertad de contratación*. Mediante esta máxima del derecho, las partes contratantes se obligan a todos los extremos de lo pactado, las cláusulas y las condiciones que tengan por

---

[44] *Pacheco v. Estancias*, 160 DPR 409, 432 (2003).
[45] *Íd.*
[46] *Rebollo v. Yiyi Motors*, 161 DPR 69, 77 (2004).
[47] *Vázquez v. Consejo Titulares*, 2025 TSPR 56, pág. 28.
[48] *Íd.*, pág. 32.
[49] *García Reyes v. Cruz Auto Corp.*, *supra*, pág. 893.
[50] *Capó Cruz v. Jta. Planificación et al.*, 204 DPR 581 (2020); *JP, Plaza Santa Isabel v. Cordero Badillo*, 177 DPR 177 (2009).
[51] Echevarría Vargas, J. A., *Derecho Administrativo Puertorriqueño*, 5ta. ed. Rev., San Juan, Ed. Situm, 2023, pág. 340.

conveniente, siempre y cuando sean conformes a la ley, a la moral y al orden público.[52]

Por otro lado, los *contratos* son negocios jurídicos y fuente de obligación.[53] Por esta razón, un *contrato* existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio.[54] Empero, para que un *contrato* se origine deben concurrir los siguientes requisitos: (i) *consentimiento* de los contratantes; (ii) *objeto* cierto que sea materia del contrato; y (iii) *causa* de la obligación que se establezca.[55] Una vez concurran las condiciones esenciales para su validez, los *contratos* serán obligatorios para las partes.[56] A su vez, "los contratos serán obligatorios, cualquiera que sea la forma en que se hayan celebrado, siempre que en ellos concurran las condiciones esenciales para su validez".[57] Lo cual implica que perfeccionado un *contrato* por el mero consentimiento, las partes están obligadas por lo expresamente convenido así como a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley.[58] Si alguno de los contratantes incurre en dolo, negligencia o morosidad en el cumplimiento de sus obligaciones, responderá por los daños y perjuicios causados.[59]

Así pues, el consentimiento en los *contratos* se manifiesta por el concurso de la oferta y de la aceptación sobre la cosa y la causa que constituya el objeto del acuerdo.[60] No obstante, la validez y el cumplimiento de la contratación no puede dejarse al arbitrio de unas de las partes.[61]

---

[52] Por tratarse de hechos ocurridos con anterioridad a la aprobación y vigencia del Código Civil de Puerto Rico de 2020 (Ley Núm. 55 de 1 de enero de 2020), nos limitaremos a discutir las disposiciones aplicables y correspondientes al Código Civil de Puerto Rico de 1930. Art. 1207 del Código Civil de 1930, 31 LPRA § 3372. *Feliciano v. Luxury Hotels Int'l.*, 210 DPR 712 (2022); *Demeter Int´l v. Srio. Hacienda*, 199 DPR 706 (2018).
[53] *Amador v. Conc. Igl. Univ. de Jesucristo*, 150 DPR 571, 581 (2000).
[54] Art. 1206 del Código Civil de 1930, 31 LPRA § 3371.
[55] Art. 1213 del Código Civil de 1930, 31 LPRA § 3391.
[56] Art. 1230 del Código Civil de 1930, 31 LPRA § 3451.
[57] Art. 1230 del Código Civil de 1930, 31 LPRA § 3451.
[58] Arts. 1210 del Código Civil de 1930, 31 LPRA § 3375.
[59] Art. 1054 del Código Civil de 1930, 31 LPRA § 3018.
[60] Art. 1214 del Código Civil de 1930, 31 LPRA § 3401.
[61] Art. 1208 del Código Civil de 1930, 31 LPRA § 3373.

El Código Civil de 1930 principia que, si los términos de un *contrato* son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas.[62] De manera opuesta, si las palabras parecieran contrarias a la intención evidente de los contratantes, prevalecerá ésta sobre aquéllas.[63] Por consiguiente, las cláusulas de los *contratos* deberán interpretarse las unas con las otras, atribuyéndole a las dudosas el sentido que resulte del conjunto de todas.[64] Nuestro Tribunal Supremo ha expresado que al igual que en el caso de un estatuto, los términos de un *contrato* deben leerse conjuntamente y armonizarse para determinar la verdadera intención de las partes.[65] Se estiman como términos claros "aquellos que por sí mismos son bastante lúcidos para ser entendidos en un único sentido, sin dar lugar a dudas, controversias ni diversidad de interpretaciones, y sin necesitar para su compresión [de] razonamientos o demostraciones susceptibles de impugnación".[66]

En cambio, si el texto del *contrato* no permite la compresión única de lo convenido es necesario recurrir a las normas de interpretación que ofrecen el Código Civil de Puerto Rico y la jurisprudencia. En última instancia, la intención de las partes será el criterio fundamental para fijar el alcance de las obligaciones contractuales.[67] La intención puede demostrarse por cualquier medio, y el juzgador deberá examinar todas las circunstancias concurrentes al otorgamiento del *contrato* para adjudicar la intención de las partes, incluyendo los actos anteriores, coetáneos y posteriores.[68] Es preciso apuntar que los tribunales tienen la facultad y el deber de velar por el cumplimiento de los *contratos*. Por tanto, no debemos relevar a una parte del cumplimiento

---

[62] Art. 1233 del Código Civil de 1930, 31 LPRA § 3471.
[63] *Íd.*
[64] Art. 1237 del Código Civil de 1930, 31 LPRA § 3475.
[65] *Caballero v. Kogan*, 73 DPR 666, 674 (1952).
[66] *Sucn. Ramírez v. Tribl. Superior*, 81 DPR 357, 361 (1959).
[67] *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 DPR 64, 69 (1983).
[68] Art. 1234 del Código Civil de 1930, 31 LPRA § 3472.

de su obligación contractual cuando el *contrato* sea legal, válido y no contenga vicio alguno.[69]

### - C – *Contrato de Adhesión*

El Artículo 1248 del Código Civil de Puerto Rico de 2020 preceptúa que "[e]l contrato es celebrado por adhesión si el aceptante se ve precisado a aceptar un contenido predispuesto".[70] Dicho de otra forma, son contratos en los cuales una sola de las partes dicta las condiciones que ha de aceptar la otra parte.[71] Las cláusulas de este tipo de contratos se han de interpretar en sentido desfavorable a la persona que las redacta y en favor de la persona que se vio precisada a aceptar su contenido.[72] A su vez, el Código Civil de Puerto Rico de 2020 contempla que son especialmente anulables en los contratos celebrados por adhesión, las cláusulas que no se redacten de manera clara, completa y fácilmente legible, en idioma español o inglés.[73]

Pero, el Tribunal Supremo ha declarado que "el hecho de que un acuerdo sea considerado un contrato de adhesión no significa que este viciado de nulidad".[74] Si el lenguaje del contrato es claro y específico, no queda margen para interpretaciones que menoscaben obligaciones contraídas al amparo de la ley.[75] Esto es, sólo cuando el *contrato de adhesión* contiene cláusulas ambiguas es que se activa la norma de interpretación contra la parte que lo redactó.[76]

### - D -*Arbitraje*

El *arbitraje* es un método alterno de solución de disputas.[77] Su propósito va dirigido a que las partes presenten sus controversias ante un ente neutral con autoridad para adjudicar e imponer una decisión a las

---

[69] *Mercado, Quilichini v. U.C.P.R.*, 143 DPR 610, 627 (1997).
[70] Art. 1248 del Código Civil de Puerto Rico de 2020, 33 LPRA § 9802. El Código Civil de Puerto Rico de 1930 no tenía una definición específica.
[71] *Arthur Young & Co. v. Vega III,* 136 DPR 157, 186 (1994).
[72] 33 LPRA § 9802.
[73] *Id.* § 9803.
[74]*Aponte Valentín et al. v. Pfizer Pharm.* 208 DPR 263, 291 (2021).
[75] *Rivera v. Insurance, Co.,* 103 DPR 91, 91- 92 (1974).
[76] *Aponte Valentín et al. v. Pfizer Pharm., supra.*
[77] *VDE Corporation v. F & R Contractors*, 180 DPR 21, 32 (2010).

partes.[78] Debido a la autonomía de la voluntad y la libertad de contratación, los contratantes quedan facultados de incluir en sus pactos una *cláusula de selección de foro*. De este modo, "[e]s indubitado el carácter contractual que comporta la figura del arbitraje".[79] Por esto, se puede exigir únicamente cuando se ha pactado y además cuando conste por escrito.[80] Es decir, las partes en un contrato se obligan a llevar ante un árbitro, mediante un procedimiento de arbitraje, las posibles controversias futuras relacionadas con su contrato.[81]

Esa facultad surge principalmente de la Ley Núm. 376 de 8 de mayo de 1951, según enmendada, conocida como *Ley de Arbitraje de Puerto Rico*, (Ley Núm. 376).[82] La Ley 376, *supra*, fue derogada recientemente por la Ley Núm. 147 de 9 de agosto de 2024, la cual entró en vigor en febrero de año 2025.[83]

En ese sentido, el Artículo 1 de la *Ley de Arbitraje de Puerto Rico*, decreta que dos o más partes podrán incluir en un convenio por escrito una disposición para el arreglo mediante arbitraje de cualquier controversia que en el futuro surgiere entre ellos de ese acuerdo o en relación con él.[84] Todo convenio de arbitraje será válido, exigible e irrevocable salvo por los fundamentos que existieran en derecho para la revocación de cualquier convenio.[85]

Por otro lado, nuestro Más Alto Foro ha reiterado que las *cláusulas de selección de foro* son *prima facie* válidas y quien se oponga a su aplicación tendrá el peso de la prueba para rebatirla.[86] A pesar de, en nuestra

---

[78] *Aquino González v. A.E.E.L.A.,* 182 DPR 1, 19 (2011).

[79] *Íd.*, pág. 33.

[80] *VDE Corporation v. F & R Contractors, supra*, pág. 33; *Municipio Mayagüez v. Lebrón*, 167 DPR 713, 720.

[81] *VDE Corporation v. F & R Contractors, supra*, pág. 32.

[82] 32 LPRA sec. 3201 *et seq.*

[83] Para el análisis de este caso, corresponde referirnos a la Ley Núm. 376, *supra*, estatuto vigente cuando el foro primario emitió la *Resolución* recurrida.

[84] 32 LPRA § 3201.

[85] *Íd.*; *Méndez Jiménez v. Carso Const.*, 202 DPR 554, 558 (2019).

[86] *Bobé et. al. v. UBS Financial Services*, 198 DPR 6, 16 (2017); *Unisys v. Ramallo Brothers*, 128 DPR 842, 855 (1991).

jurisdicción se implantó una serie de criterios que se han de considerar para determinar si las referidas cláusulas son inaplicables. En concreto, las *cláusulas de selección de foro* no aplicarán en las siguientes circunstancias:

> (1) El foro seleccionado resulta ser irrazonable e injusto; (2) De ventilarse el caso en dicho foro, se incurriría en una clara y patente inequidad, o sería irrazonable o injusto; (3) La cláusula no es válida porque fue negociada mediando fraude o engaño; y (4) La implantación de dicha cláusula derrotaría la política pública del Estado.[87]

De modo que, la parte que impugne la aplicación de la *cláusula de selección de foro* tiene que demostrar que a ésta le aplica una de las mencionadas excepciones.[88] Ello es así porque, "[l]a validez y el cumplimiento de los contratos no puede dejarse al arbitrio de uno de los contratantes".[89] Incluso, si la *cláusula de selección de foro* fue producto de la negociación entre las partes contratantes, quienes tuvieron que considerar las ventajas y desventajas del foro seleccionado, no es suficiente alegar que ese foro es inconveniente para que un tribunal decrete su inaplicabilidad.[90]

Por otra parte, el Tribunal Supremo de Puerto Rico ha sido consistente al expresar que en Puerto Rico existe una fuerte política pública a favor del arbitraje, y toda duda que pueda existir sobre si procede o no el arbitraje, debe resolverse a favor de éste.[91] Por tanto, existe una presunción de arbitrabilidad cuando el contrato contiene una *cláusula de arbitraje*.[92] Asimismo, se ha reiterado que "ante un convenio de arbitraje lo prudencial es la abstención judicial, aunque esa intervención no esté vedada".[93] Es decir, cuando se pacta un proceso de arbitraje en un contrato, los tribunales carecen de discreción para determinar su eficacia y tienen que dar cumplimiento al arbitraje según lo acordado.[94]

---

[87] *Íd., pág. 857.*
[88] *Abengoa, S.A. v. American Intl. Ins*., 176 DPR 512, 521 (2009).
[89] *Íd.,* pág. 521.
[90] *Íd.,* pág. 521.
[91] *S.L.G. Méndez-Acevedo v. Nieves Rivera*, 179 DPR 359, 368 (2010).
[92] *World Films Inc. v. Paramount Pict. Corp.*, 125 DPR 352, 362 (1990); *U.C.P.R. v. Triangle Engineering Corp.*, 136 DPR 133, 143-144 (1994).
[93] *S.L.G. Méndez Acevedo v. Nieves Rivera,* supra, pág. 368; *Municipio Mayagüez v. Lebrón,* supra, pág. 721; *U.C.P.R. v. Triangle Engineering Corp., supra,* pág. 142.
[94] *S.L.G. Méndez-Acevedo v. Nieves Rivera, supra*, pág. 368; *PaineWebber Inc. v. Soc. de Gananciales,* 151 DPR 307, 311-312 (2000).

Ahora bien, el Tribunal Supremo ha expresado que la validez y aplicabilidad de una *cláusula de arbitraje* es un asunto que se debe atender antes de examinar la validez de un contrato en general.[95] Esto es, un foro debe determinar primeramente la validez de la *cláusula de selección de foro*, y quien se oponga a su aplicación tiene el deber de probar su invalidez.[96] Al respecto, el Tribunal Supremo ha expresado que:

> ... no bastará con alegar que el contrato en general se suscribió con esos medios, sino que habrá de demostrar que la cláusula de selección de foro se introdujo al contrato mediante fraude o engaño. De lo contrario, la cláusula mantiene su vigencia y las controversias que surjan del contrato, incluyendo las alegaciones de fraude en la contratación, se deberán adjudicar en el foro acordado.[97]

Es decir, no serán suficientes las alegaciones contra el contrato en general sino que la inclusión de la cláusula de selección de foro fue mediante fraude o engaño.

### - III -

En su recurso, **WINDMAR** puntualizó que **DACo** no tiene jurisdicción sobre la materia para adjudicar la *Querella* promovida por el señor **RODRÍGUEZ CARDONA**. En específico, manifestó que el ACUERDO, firmado por ambas partes, específicamente contiene en el inciso número 8 sobre los *Términos y Condiciones de la Venta* una cláusula de arbitraje clara y detallada que reemplaza el derecho de acudir ante Tribunal o agencia administrativa para resolver las controversias que surjan del mismo. De igual manera, pormenorizó que, con dicha *cláusula de arbitraje*, las partes estuvieron de acuerdo en que cualquier controversia, reclamación o desacuerdo sería resuelto exclusivamente por arbitraje. Por ello, aseveró que **DACo** incurrió en un error manifiesto en la apreciación de la prueba presentada en la audiencia administrativa, así como la que obra en el expediente.

---

[95] *Bobé et. al. v. UBS Financial Services, supra*, pág. 23.
[96] *Íd.*
[97] *Íd.*, págs. 23- 24.

En cambio, el señor **RODRÍGUEZ CARDONA** reseñó que el contrato objeto de controversia es uno de adhesión, en el cual el cliente no tiene la oportunidad de negociar los términos, ni modificar las cláusulas, de así quererlo. Elucidó que la referida cláusula es vaga, y no cumple con los requerimientos de la Ley Núm. 57 de 27 de mayo de 2014, conocida como *Ley de Transformación y ALIVIO Energético*, al no incluir las advertencias necesarias. Del mismo modo, planteó que como se trata de una reclamación por prácticas y anuncios engañosos al ofrecer al consumidor un producto de calidad superior para, ulteriormente, proveerle uno de calidad inferior, correspondía la instalación de los microinversores acordados. Veamos.

Es evidente que no existe controversia sobre el hecho cierto de que el contrato suscrito por las partes, en efecto, contiene una *cláusula de arbitraje*. En particular, el inciso número 8 de los *Términos y Condiciones de la Venta*, lee de la siguiente manera:

> ...EL ARBITRAJE **REEMPLAZA EL DERECHO DE IR AL TRIBUNAL O AGENCIA ADMINISTRATIVA**, INCLUYENDO EL DERECHO A UN JURADO Y EL DERECHO A PARTICIPAR EN UNA DEMANDA O PLEITO DE CLASE O DE UN PROCEDIMIENTO SIMILAR. EN EL ARBITRAJE, LA CONTROVERSIA ES RESUELTA POR UN ÁRBITRO EN VEZ DE UN JUEZ O JURADO.
> [...]
> Las leyes del estado donde su Hogar está localizado regirán este Acuerdo sin dar lugar a conflictos de principios legales. Si usted se encuentra en incumplimiento de este Acuerdo, Sunnova podría escoger, a su entera discreción, remedios disponibles bajo los términos de este Acuerdo ya sean en ley, o en equidad. **Acordamos las partes que cualquier otra disputa, reclamación o desacuerdo entre nosotros (una "Disputa") serán resueltas exclusivamente por arbitraje salvo lo dispuesto específicamente a continuación**.
>
> Las Disputas cubiertas bajo este Acuerdo incluyen, sin limitación: **reclamos que surjan o estén relacionados con este Acuerdo**; reclamos que surjan o estén relacionados con nuestra relación; reclamos que hayan surgido antes de este u otro Acuerdo (incluyendo, pero no limitado, reclamos relacionados con publicidad); r**eclamos de protección del consumidor**, y reclamos bajo cualquier estatuto federal o del Estado Libre Asociado de Puerto Rico.

Finalmente, la cláusula culmina con la siguiente advertencia, seguido de la firma del señor **RODRÍGUEZ CARDONA**:

**USTED ENTIENDE QUE USTED ESTA ACORDANDO VOLUNTARIAMENTE A SOMETER A ARBITRAJE LAS DISPUTAS QUE SURJAN DE ESTE ACUERDO Y AUTORIZA Y DECLARA QUE HA LEÍDO ESTA SECCIÓN Y ESTA DE ACUERDO CON SUS TÉRMINOS.**[98]

Evoquemos que nuestro Tribunal Supremo ha reiterado en múltiples ocasiones que quien pretenda rebatir la validez de una *cláusula de arbitraje* **tiene el deber de probar su invalidez**.[99] En este caso en particular, el señor **RODRÍGUEZ CARDONA** disputa la validez del contrato suscrito con **WINDMAR**. Toda vez que, al momento de vender el sistema fotovoltaico, el señor Colón, representante de la compañía, lo orientó, le atestó que se le estaría instalando un microinversor IQ7+, pero el equipo instalado consistió en el antiguo microinversor IQ7 y ello incidió sobre el objeto determinado del contrato, y, en su decisión final de firmar del referido contrato.

Así las cosas, justipreciado el expediente ante nuestra consideración, colegimos que el señor **RODRÍGUEZ CARDONA** no logró colocar a este Tribunal en posición para determinar que la *cláusula de arbitraje* es inválida o medió fraude y engaño al momento de suscribirse el ACUERDO. En cambio, nos parece que la aludida *cláusula de arbitraje* no es ambigua ni deja margen a dudas. Por tanto, las partes quedan vinculadas y el procedimiento a seguir debe ser el del arbitraje.

Evidentemente, el señor **RODRÍGUEZ CARDONA,** sin duda, tiene el derecho de objetar la validez del contrato en general, de haber mediado fraude en la contratación. A pesar de eso, en relación a la *cláusula de selección de foro* o de arbitraje, es preciso apuntalar que el Tribunal Supremo ha sido consistente en determinar que estas se presumen válidas.[100] Por ello, su validez y aplicabilidad "es un asunto de umbral que se debe atender antes de examinar la validez de un contrato en general".[101] A la luz de lo antes expuesto, determinamos que la *cláusula de arbitraje* se presume válida, por

---

[98] Apéndice del *Recurso de Revisión Judicial,* págs. 26- 28.
[99] *Bobé et. al. v. UBS Financial Services, supra*, pág. 23.
[100] *De Jesús González v. A.C.*, 148 DPR 255, 271 (1999).
[101] *Bobé et. al. v. UBS Financial Services, supra*, pág. 23.

lo que la reclamación sobre la alegada validez del contrato levantada por el señor **RODRÍGUEZ CARDONA** debe ser dirimida mediante el proceso de arbitraje conforme lo pactado en el ACUERDO suscrito. Aun cuando **DACo** decidió que tenía jurisdicción para atender la controversia, correspondía referir el caso a la entidad pactada en este caso, la *American Arbitration Association*, la cual fue reincorporada ante el Departamento de Estado de Puerto Rico desde el 30 de junio de 2023.[102] Ello antes de la audiencia de 18 de julio de 2023. Así pues, la cláusula mantiene su vigencia y las controversias que surjan del ACUERDO, incluyendo las alegaciones de fraude en la contratación, se deberán adjudicar en el foro acordado.

- **IV** -

Por los fundamentos que anteceden, *revocamos* la *Resolución* dictada el 21 de agosto de 2023 por **DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR** (**DACo**); y *desestimamos* la *Querella* trabada el 20 de septiembre de 2021 por el señor **RODRÍGUEZ CARDONA**.

**Notifíquese inmediatamente.**

Lo acordó el Tribunal y lo certifica la Secretaría del Tribunal de Apelaciones.

La Jueza Cintrón Cintrón disiente del resultado sin opinión escrita.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[102] Apéndice del *Recurso de Revisión Judicial,* págs. 474- 479.